UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD WAYNE MORSE,<br><br>  Petitioner,<br><br>  v.<br><br>BRIAN D. PHILLIPS,<br><br>  Respondent. | No. 1:23-cv-00196-JLT-SKO (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[THIRTY DAY OBJECTION DEADLINE]** |

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently in state prison serving a life sentence for four counts of committing a lewd and lascivious act on a child under fourteen years of age. Petitioner claims a violation of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966), and he claims the evidence was insufficient to support the guilty verdict. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

## I.     PROCEDURAL HISTORY

On October 25, 2018, a Stanislaus County jury found Petitioner guilty of four counts of committing a lewd and lascivious act on a minor under the age of fourteen (Cal. Penal Code §

1

288(A)). (Doc. 9-2 at 189.[1]) On December 21, 2018, the court sentenced Petitioner to three concurrent terms of 25 years to life on counts one, two, and four, and a consecutive term of 15 years to life on count three. (Doc. 9-2 at 189.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). On June 10, 2022, the appellate court affirmed the judgment. People v. Morse, No. D079880, 2022 WL 2092822 (Cal. Ct. App. 2022). Petitioner filed a petition for review in the California Supreme Court. (Doc. 9-18.) On August 17, 2022, the California Supreme Court summarily denied the petition. (Doc. 9-19.)

On February 9, 2023, Petitioner filed the instant habeas petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on April 7, 2023. (Doc. 10.) On May 8, 2023, Petitioner filed a traverse. (Doc. 11.)

## II.    FACTUAL BACKGROUND

The facts are derived from the appellate court's Statement of Facts in its unpublished decision[2]:

### A. Report of Molestation

On March 11, 2016, Petitioner's wife, Consuelo, learned that Petitioner had molested her niece, Jane Doe 1. Consuelo asked her daughters from a prior relationship, Jane Doe 2 and Jane Doe 3, whether "that had also happened to them or not." They responded that Petitioner had "touched" them. Consuelo called the police, and while waiting for the police to arrive, she confronted Petitioner with the allegations, and he said "he did do it" and "was remorseful."

### B. Police Interview and Arrest

Officer Cameron Cromwell, two other police officers, and two police department explorers[3] responded to Consuelo's call. Cromwell and the two other officers wore uniforms and were armed with handguns; the two explorers wore different uniforms and were not armed. When

---

[1] Unless otherwise noted, references are to ECF pagination.
[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts as set forth in Morse, 2022 WL 2092822, at *1-3. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).
[3] According to Cromwell, the explorers "ride out with us trying to figure out what's [sic] law enforcement involved."

the officers and explorers arrived, Petitioner, Consuelo, her two daughters, Petitioner's mother, and her partner were in the home. Cromwell saw Petitioner at the top of the stairs talking to a lawyer on the telephone, and asked him to come downstairs to pat him down for safety. After the pat down, Cromwell asked Petitioner to wait with the other officers, explorers, Petitioner's mother, and her partner in a room, where they engaged in small talk while Cromwell interviewed Jane Doe 3. The officers stood near the front door of the home. Petitioner remained in the room for about 50 minutes.

After finishing the interview of Jane Doe 3, Cromwell went to the room where Petitioner was sitting with the others and asked whether there was a place inside or outside he would feel comfortable talking to Cromwell. Petitioner then led Cromwell to a small bedroom. Cromwell told Petitioner he could take a seat if he wanted, and he sat on the bed while Cromwell stood near the open doorway because there was no place else to sit. Cromwell told Petitioner, "You know why we're here, I'm assuming 'cause it sounded like Consuelo talked to you before I got here." Petitioner responded, "Yes." Cromwell did not give Petitioner the <u>Miranda</u> warnings[4] and asked him, "[D]o you wanna talk to me about this?" Petitioner did not answer the question directly and proceeded to speak with Cromwell for about 23 minutes.

During the interview, Petitioner stated that about six or seven years ago when he returned from military deployment, he was taking medication for "sleep issues" and depression and would wake up in the bedroom of his stepdaughters, Jane Doe 2 and Jane Doe 3. Petitioner said his hand was once under the shirt of Jane Doe 3 "rubbing her belly." When Cromwell asked Petitioner whether he had touched Jane Doe 3 anyplace else, he said, "Not that I remember, but like I said I don't remember what I was doing or where I was at. I mean kinda figured I was or maybe I did more but I guess I just didn't wanna realize it." Petitioner said he "might have" touched Jane Doe 3 in other spots, but he did not remember ever touching her breasts or genitals. He did not

---

[4] "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, ... [h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (<u>Miranda, supra</u>, 384 U.S. at pp. 478-479.)

remember ever touching Jane Doe 2 on her genitals or elsewhere. Petitioner said he was "pretty sure" his stepdaughters told police "the truth about what happened," and he was "[v]ery sorry" for what happened. During the interview, Cromwell did not tell Petitioner either that he was free to leave and did not have to speak to Cromwell, or that he was not free to leave and had to speak to him, and Petitioner never indicated he did not want to speak to Cromwell. At the conclusion of the interview, Cromwell arrested Petitioner. Cromwell was not planning to arrest Petitioner after he interviewed Jane Doe 3, and decided to do so after he interviewed Petitioner.

### *C. Charges*

Petitioner was charged with five counts of committing a lewd and lascivious act on a child under the age of 14 years. (Pen. Code, § 288, subd. (a).)  Counts 1 and 2 were based on separate acts Petitioner committed against his niece, Jane Doe 1, between January 4, 2016, and March 7, 2016. Count 3 was based on an act Petitioner committed against his stepdaughter, Jane Doe 2, between November 1, 2009, and October 31, 2011. Count 4 was based on an act Petitioner committed against his stepdaughter, Jane Doe 3, between December 9, 2011, and December 8, 2012. Count 5 was based on an act Petitioner committed against his niece, Jane Doe 4, between January 10, 2015, and January 9, 2016. As to each count, the People alleged Petitioner was subject to punishment under the One Strike law because he had committed lewd and lascivious acts against multiple victims. (§ 667.61, subd. (e).)

### *D. Motion in Limine to Exclude Interview*

Before trial, Petitioner filed a motion to exclude his statements to Cromwell as having been obtained in violation of his Miranda rights. In opposition, the People conceded Petitioner had been interrogated, but argued no Miranda warnings were required because he was not in custody when Cromwell questioned him. The trial court held a hearing at which Cromwell testified and the video and audio recording of his interview of Petitioner was played. After hearing arguments from counsel, the court ruled Petitioner was not in custody during the interview and the People could introduce it in evidence.

### *E. Trial*

Jane Doe 1 testified that before she turned nine years old, Petitioner placed his hand on

4

her genital area once at her house and another time at his house, but she could not remember whether it was over or under her clothes. Jane Doe 1's mother testified she once found Petitioner and Jane Doe 1 alone in Jane Doe 1's room, and when the mother entered, Jane Doe 1 jumped off her bed and Petitioner was kneeling or squatting about four inches in front of her. Jane Doe 1's mother further testified that after Petitioner got up and left the room, Jane Doe 1 looked scared and was crying, but said nothing had happened. Jane Doe 1 later told her mother Petitioner "had been touching her ... for a long time."

Jane Doe 2 testified that when she was eight or nine years old, Petitioner more than once put his hand inside her pants and underwear, touched her genitals, and told her to stay quiet and not to tell her mother. Jane Doe 2 later told her sister, Jane Doe 3, about the incidents, and they told Consuelo, who called the police.

Jane Doe 3 testified that when she was 13 or 14 years old, she woke up scared from a nightmare, went to the bedroom of Petitioner and Consuelo, and got into their bed. Petitioner put his hand on her genital area over her clothes and pushed her underwear into her vagina with his finger. When the prosecutor reminded Jane Doe 3 she had testified at the preliminary examination that she was 13 years old when this incident happened, she agreed she was 13 and was in seventh or eighth grade. On cross-examination, Jane Doe 3 admitted she "could ... have been 14" when the incident happened and was "completely unsure one way or the other" whether she was 13 or 14. On redirect examination, Jane Doe 3 testified her brother was still in diapers when Petitioner touched her genital area over her clothes and pushed her underwear into her vagina with his finger. Consuelo testified Jane Doe 3 stopped going into Consuelo and Petitioner's bedroom to sleep when Jane Doe 3 was in middle school, and the brother stopped wearing diapers in April or May 2010, when Jane Doe 3 was 11 years old. On redirect examination, Jane Doe 3 also confirmed she was in seventh or eighth grade when the incident occurred and her testimony at the preliminary examination about her age at the time of the incident was "accurate." On recross-examination, Jane Doe 3 testified she could have been 13 or 14 at the time of the incident, but she was "more sure that it happened when [she] was 13 than 14 considering [she] was going into high school when [she] was 14, and [she] kn[e]w that it happened before that."

5

Jane Doe 4, Petitioner's niece, testified that when she was "like 10," Petitioner on two occasions sat beside her on a couch and put his hand on her genital area over her clothes. Jane Doe 4 further testified she told her mother and Consuelo about the incidents. Both Jane Doe 4's mother and Consuelo denied Jane Doe 4 had told them about either incident. The parties stipulated the first time Jane Doe 4 told anybody Petitioner had touched her was on June 23, 2016, and the person she told was a county social worker. Jane Doe 4 also testified she saw Petitioner put his hand on the genital area of her sister, Jane Doe 1, over her clothes.

The prosecutor played a video and audio recording of Cromwell's interview of Petitioner for the jury. A transcript of the interview was admitted in evidence.

Petitioner testified he was having sleep issues in 2012 and once woke up in Jane Doe 3's bed rubbing her belly. He denied ever touching her "private areas." Petitioner did not remember Jane Doe 3 ever coming into his and Consuelo's bedroom to sleep. He denied ever touching Jane Doe 1, Jane Doe 2, or Jane Doe 4 on their genitals or putting his hand down their pants.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). The petitioner "must show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" Shinn v. Kayer, ___ U.S. ___, ___ , 141 S.Ct. 517, 523, 2020 WL 7327827, *3 (2020) (quoting Virginia v. LeBlanc, 582 U. S. 91, 93, 137 S.Ct. 1726, 1728 (2017) (*per curiam*)). Rather, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility of fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added); see also Kayer, 141 S.Ct. at 523, 2020 WL 7327827, *3. Congress "meant" this standard to be "difficult to meet." Richter, 562 U.S. at 102.

The second prong pertains to state court decisions based on factual findings. Davis v.

7

Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C. Review of Petition

1. Ground One

Petitioner first alleges his constitutional rights under Miranda were violated by the admission of Petitioner's statements to Officer Cromwell. Petitioner raised this claim on direct review in the state courts. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Morse argues the judgment must be reversed because the trial court erroneously admitted his interview with Cromwell. He contends the interview was not admissible because he had not been given the warnings *Miranda* requires when a suspect is interrogated in a police-dominated atmosphere (see fn. 2, *ante*), and the error in admitting such an "'evidentiary bombshell'" in a case where the evidence was far from overwhelming prejudiced the defense. The People respond that *Miranda* warnings were not required because Morse was not questioned while he

8

waited in the room with others while Cromwell interviewed Jane Doe 3 and could have terminated his own interview with Cromwell and left at any time. The People further respond that any error in admitting the interview was harmless beyond a reasonable doubt because the certain, detailed, and consistent testimony of the victims, which was corroborated by other witnesses, provided overwhelming evidence of Morse's guilt. We conclude there was no *Miranda* violation and therefore need not, and do not, address the parties' arguments concerning prejudice.

1. *Standard of Review*

Whether a defendant was in custody for *Miranda* purposes presents a mixed question of law and fact. We review the trial court's factual findings on the circumstances of the interrogation for substantial evidence and decide independently whether under the totality of the circumstances a reasonable person in the defendant's position would have felt free to stop the questioning and leave. (*People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*); *In re I.F.* (2018) 20 Cal.App.5th 735, 760; *People v. Macklem* (2007) 149 Cal.App.4th 674, 695.)

2. *Governing Law*

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra*, 384 U.S. at p. 444.) "As used in [the] *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508-509 (*Howes*).) To constitute custody for *Miranda* purposes, there must be restraint on the person's freedom of movement in an "environment [that] presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Howes*, at p. 509.) To determine whether the person was in custody for *Miranda* purposes, California courts have identified the following factors as relevant:

1. whether police or the person interrogated initiated contact with law enforcement, and if police did so, whether the person voluntarily agreed to an interview;
2. whether the express purpose of the interview was to question the person as a witness or as a suspect;
3. the location of the interview;
4. whether police informed the person he or she was under arrest or in custody;
5. whether police informed the person he or she was free to stop the interview and leave at any time, or whether the person's conduct indicated an awareness of such freedom;
6. whether the person's freedom of movement was restricted during the interview;
7. the length of the interview;
8. the number of police officers who participated;
9. whether police dominated and controlled the interview;
10. whether police manifested a belief the person was guilty and had evidence to prove it;
11. whether police were aggressive, confrontational, or accusatory;
12. whether police used techniques to pressure the suspect; and
13. whether police arrested the person at the end of the interview.

9

(*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 (*Aguilera*); accord, *People v. Potter* (2021) 66 Cal.App.5th 528, 539-540 (*Potter*); *People v. Torres* (2018) 25 Cal.App.5th 162, 172-173 (*Torres*); *People v. Saldana* (2018) 19 Cal.App.5th 432, 455 (*Saldana*).)

### 3. *Analysis*

The parties agree Morse was interrogated for purposes of *Miranda*. Morse concedes "[t]here were no findings of fact or credibility disputes, as the evidence, including what Cromwell related, is included in the [video and audio] recordings and transcripts." We thus proceed to determine independently whether the interrogation was "custodial," i.e., whether under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." (*Thompson v. Keohane* (1995) 516 U.S. 99, 112 (*Thompson*); accord, *Kopatz, supra*, 61 Cal.4th at p. 80; see *Torres, supra*, 25 Cal.App.5th at p. 173 [when interview is recorded, facts are undisputed and subject to independent review on appeal].)

Factors Nos. 1, 2, 5, 8, and 13 from the list in part II.A.2., *ante*, weigh, at least partially, in favor of a finding the interrogation was custodial. Police initiated contact with Morse to discuss the allegations of sex crimes his stepdaughters and nieces made against him (factor Nos. 1 & 2). (*Torres, supra*, 25 Cal.App.5th at p. 176 [detectives interviewed defendant as suspect after receiving complaint he molested child].) Cromwell never told Morse "he was free to terminate the interview and leave if he wished" (factor No. 5). (*Aguilera, supra*, 51 Cal.App.4th at p. 1164.) Three armed police officers and two police explorers were present in Morse's home before and during the interview (factor No. 8). (*United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1085 (*Craighead*) ["the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere"]; *People v. Lopez* (1985) 163 Cal.App.3d 602, 608 (*Lopez*) [ratio of officers to suspects is relevant to custody determination].) Cromwell arrested Morse at the end of the interview (factor No. 13). (*Saldana, supra*, 19 Cal.App.5th at p. 461 [defendant was arrested "just a few minutes" after he confessed].)

All factors except Nos. 2 and 13 weigh, again at least partially, against a finding the interrogation was custodial. When Cromwell asked Morse whether he wanted to talk about the allegations, Morse willingly answered Cromwell's questions for about 23 minutes (factor No. 1). (*Torres, supra*, 25 Cal.App.5th at p. 173 ["Torres voluntarily agreed to an interview"]; *Saldana, supra*, 19 Cal.App.5th at p. 455 ["Saldana voluntarily agreed to be questioned"].) The interview occurred in Morse's home, in a bedroom to which Morse led Cromwell after he asked whether there was a place inside or outside where Morse would feel comfortable talking (factor Nos. 3 & 5). "[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial" (*United States v. Newton* (2d Cir. 2004) 369 F.3d 659, 675), "because individuals in a familiar environment are less likely to be intimidated by law enforcement officers" (*United States v. Rakowski* (D.Vt. 1987) 714 F.Supp. 1324, 1334). During the interview, Morse "was neither told that he was under arrest nor that he was not free to leave" (*Lopez, supra*, 163 Cal.App.3d at p. 608), and he was not "handcuffed or otherwise restrained" (*Potter, supra*, 66 Cal.App.5th at p. 542; see *Saldana*, at p. 459 ["Saldana was not handcuffed"]) (factor Nos. 4 & 6). The interview lasted 23 minutes, which is shorter than other interviews whose lengths courts have determined weighed against a finding the interview was custodial (factor No. 7). (*People v. Linton* (2013) 56 Cal.4th 1146, 1167 (*Linton*) ["about a half-hour"];

*Potter*, at p. 542 [30 minutes]; *Torres*, at p. 173 [45 minutes]; *Saldana*, at p. 459 ["less than an hour"].) Cromwell was the only police officer who questioned Morse, and he used a "courteous and polite" tone, did not "threaten or intimidate" Morse, and did not state he "considered [Morse] to be guilty" or "had the evidence to prove his guilt in court" (factor Nos. 8-12). (*People v. Spears* (1991) 228 Cal.App.3d 1, 25; see *Lopez*, at p. 608, fn. 4 ["Accusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave. [Citation.] General investigatory questioning may convey a different message."].)

Having considered the totality of the circumstances of Cromwell's interview of Morse, we conclude the factors weighing against a finding the interview was custodial preponderate over those weighing in favor of a finding it was custodial, and Morse therefore was not entitled to *Miranda* warnings. In reaching this conclusion, we are mindful the warnings are designed to prevent the loss of a person's right not to "be compelled in any criminal case to be a witness against himself" (U.S. Const., 5th Amend.) when the person is "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures" (*Miranda, supra*, 384 U.S. at p. 457). Such an environment, according to *Miranda*, "is created for no purpose other than to subjugate the individual to the will of his examiner," and its "inherently compelling pressures ... work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (*Id*. at pp. 457, 467.) Morse was not "thrust into an unfamiliar atmosphere" (*id*. at p. 457) when Cromwell interviewed him. Morse was at home with his family and chose to be interviewed in a room in which he felt comfortable and to which the door was kept open. (Cf. *People v. Butterfield* (1968) 258 Cal.App.2d 586, 590 (*Butterfield*) [police interview of defendant in a room with an open door "in the friendly and familiar environs of his own home" where his mother was present was not custodial].) (Fn.4.) Nor was Morse "run through menacing police interrogation procedures." (*Miranda*, at p. 457.) "[O]n the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*Aguilera, supra*, 51 Cal.App.4th at p. 1164.) Cromwell did not "use[ ] compulsion, threats or trickery to make [Morse] talk." (*Butterfield*, at p. 590.) "[T]he nature of the interview in this case, which was brief and not accusatory, would not convey to the reasonable person the impression that he or she was in custody ...." (*People v. Stansbury* (1995) 9 Cal.4th 824, 832.) In sum, the environment in which Cromwell questioned Morse did not "present[ ] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." (*Howes, supra*, 565 U.S. at p. 509.)

> (Fn.4.) *Miranda* itself recognized the significant difference between questioning a suspect at home and at a police station. The "'principal psychological factor contributing to a successful interrogation is privacy—being alone with the person under interrogation.'" (*Miranda, supra*, 384 U.S. at p. 449.) "'If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.'" (*Id*. at pp. 449-450.)

11

Morse disagrees and identifies several circumstances he contends show he "was under the functional equivalent of arrest" during the police interview. (Bolding and initial capitalization omitted.) Relying on the factors identified in *Craighead, supra,* 539 F.3d 1073, Morse contends the atmosphere of his home was "police-dominated" because (1) three armed police officers and two unarmed explorers were in the home; (2) police "restrained" him by interrupting his telephone call with a lawyer, telling him to come downstairs, patting him down, telling him to sit in a room with his mother and her partner for about 50 minutes while he waited to be interviewed, and standing guard over him by blocking the front door and hallway; (3) he was "isolated" during the interview because Cromwell did not invite Morse's mother or her partner into the bedroom where Cromwell stood in the doorway and questioned Morse; and (4) police never told Morse he was free to go, did not have to speak to Cromwell, and could terminate the interview at any time. We are not persuaded.

In *Craighead, supra*, 539 F.3d 1073, FBI agents obtained a warrant to search Craighead's home for child pornography, and eight officers from three different law enforcement agencies participated in the subsequent search. (*Id*. at p. 1078.) All of the officers were armed, and some unholstered their guns in Craighead's presence. (*Ibid*.) One FBI agent said she wanted to talk to Craighead and told him he was not under arrest, any statement he might make would be voluntary, he would not be arrested that day, and he was free to leave. (*Ibid*.) The agent and a detective "directed" and "escorted" Craighead to a storage room at the back of the house for a private conversation while other officers searched the house. (*Id*. at pp. 1078, 1086.) The storage room door was closed, and the detective, who was visibly armed, stood leaning against the wall near the door. (*Ibid*.) The interview lasted 20 to 30 minutes. (*Id*. at p. 1078.) The appellate court ruled that under those circumstances "[t]he interrogation within Craighead's home was custodial, and *Miranda* warnings were required." (*Craighead*, at p. 1089.)

The circumstances of Morse's interview are not similar to those of the interview in *Craighead, supra*, 539 F.3d 1073. Although five law enforcement personnel entered Morse's home, they were summoned to the home by Consuelo, they did not search the home, only three were armed, and none unholstered a firearm. Morse was neither directed nor escorted to a room where he was questioned behind a closed door by one officer while another stood near the door. Rather, Morse was questioned in a room of his choosing to which he led Cromwell after Cromwell asked Morse whether there was a place inside or outside the house where he would feel comfortable talking. The door remained open throughout the interview, and, contrary to Morse's assertion that Cromwell "effectively blocked" the only exit by standing in the doorway, the recording of the interview shows Cromwell stood inside the room near the door and faced Morse while he sat on the bed. Thus, Morse was not "isolated" from his mother and her partner, who remained nearby even though they were not invited into the room for the interview, likely because their presence would have made Morse uncomfortable given the "obviously distasteful" subject matter of the interview. (*Butterfield, supra*, 258 Cal.App.2d at p. 590.)

Nor was Morse "restrained, either by physical force or by threats" (*Craighead, supra*, 539 F.3d at p. 1085), during the 50 minutes between the arrival of police and the interview. (Fn.5.) Morse was on the telephone with a lawyer when one of the police officers arrived and said, "Would you mind just coming down here? I can pat you down and make sure you don't have anything on you." Morse descended the stairs about 30 seconds later, and the record does not indicate how long he had been talking to the lawyer before police arrived. We thus disagree with

12

Morse that police "in essence" told him "to get off the phone with [the] lawyer." The patdown was done in the presence of Morse's mother and her partner and lasted about 10 seconds. (Cf. *Maryland v. Shatzer* (2010) 559 U.S. 98, 113 ["temporary and relatively nonthreatening detention" of stop and frisk "does not constitute *Miranda* custody"].) Morse then sat in a room with his mother and her partner while he waited to be interviewed by Cromwell, and during that time Morse provided police with identification and contact information, participated in casual conversation, and occasionally looked at his telephone. The record does not support Morse's assertions police told him to stay in the room and blocked his exit. Shortly after arriving at Morse's home, an officer stated in quick succession, "Let me get him a chair," and "Stay right here," but it does not appear the statements were directed to Morse, because he had not yet descended the stairs or sat down in the folding chair set up for him. Video recordings during the time Morse sat in the room with his mother and her partner show one police officer stood in front of a window facing Morse, another officer stood at or near the foot of the stairs and frequently moved around and left the area, one of the explorers stood near the front door, and the other explorer stood by the stairs. Nobody was ever blocking the many exits from the room. In fact, Morse's mother exited and entered the room four times, and nobody was ever in her way. Morse never attempted to leave the room, was not instructed not to do so, and was not prevented from doing so. (Cf. *United States v. Panak* (6th Cir. 2009) 552 F.3d 462, 467 [in-home interview by law enforcement officers was noncustodial when suspect was neither physically restrained nor told she could not leave]; *Linton, supra*, 56 Cal.4th at p. 1167 [same when suspect was not physically restrained and exit from interview room was not blocked].) Hence, while Morse waited to be interviewed, he was not subject to "'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" (*Thompson, supra*, 516 U.S. at p. 112.)

> (Fn.5.) The People assert there was no violation of Morse's *Miranda* rights during this period because there was no interrogation. *Miranda* warnings are required only for "custodial interrogation" (*Miranda, supra*, 384 U.S. at pp. 444-445), and without interrogation the warnings need not be given (*Edwards v. Arizona* (1981) 451 U.S. 477, 486). We agree the casual conversation in which Morse participated with police while he sat waiting to be interviewed by Cromwell did not constitute interrogation and thus Morse was not entitled to *Miranda* warnings before the conversation. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [interrogation means words or actions by police that are reasonably likely to elicit incriminating response from suspect]; *People v. Gamache* (2010) 48 Cal.4th 347, 388 ["small talk is permitted"].) We consider the conversation and the other circumstances of the waiting period only as they relate to our determination whether, under the totality of the circumstances, Morse was in custody when Cromwell questioned him.

In sum, "[w]e conclude that [Morse] was not, in the above cited circumstances, subjected to the coercive, police-dominated atmosphere which was *Miranda*'s concern; that he was therefore not in custody when questioned; and that *Miranda* advice was not required. The trial court's denial of [Morse's] motion to exclude his statements from evidence was therefore correct." (*Lopez, supra*, 163 Cal.App.3d at p. 609.)

Morse, 2022 WL 2092822, at *3-7.

### a. Legal Standard

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself." A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning. Miranda v. Arizona, 384 U.S. 436, 469–73 (1966). In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473–74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

"Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). Although "those types of situations" may vary, they all share two essential elements: "custody and official interrogation." Illinois v. Perkins, 496 U.S. 292, 296–97 (1990).

Two distinct inquiries are essential to the Miranda custody test: "(1) the circumstances surrounding the interrogation, and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave." Yarborough v. Alvarado, 541 U.S. 652, 653 (2004). The inquiry focuses on the objective circumstances of the interrogation. Id. The court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127 (9th Cir.1987); see also United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001). The Ninth Circuit has noted the following factors to be relevant to deciding that question: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the

interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066 (citing Beraun–Panez, 812 F.2d at 580). "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators; the Beraun–Panez/Hayden factors are simply ones that recur frequently." United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

Error in admitting statements obtained in violation of Miranda is deemed harmless for purposes of federal habeas review unless the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).

b.     Analysis

In this case, the Fifth DCA applied clearly established Supreme Court precedent. Therefore, the question for this Court is whether that application was unreasonable. In light of the record, a rational jurist could conclude that the state court determination that Petitioner was not in custody at the time of the confession was reasonable.

As noted by the state court, certain factors weighed in favor of finding Petitioner was in custody during the interrogation. Police initiated the contact that led to Petitioner's statements. Petitioner was not told that he was free to leave or terminate the interview at any time. Three armed officers and two unarmed police explorers were present in the house at the time. And finally, Petitioner was arrested immediately after the interview.

As noted by the court, however, a significant number of factors weighed against a finding that the interrogation was custodial. Only one officer (Cromwell) questioned Petitioner. Cromwell initiated the conversation by asking Petitioner if he wanted to talk to which Petitioner willingly answered Cromwell's questions. Petitioner was interviewed in his home, not in a police station, and he was questioned after Cromwell had asked him if there was some place they could go where Petitioner would feel comfortable talking. Cromwell was courteous and polite and did not threaten or intimidate Petitioner. Petitioner was never told he was under arrest or not free to leave until after the interview concluded. Finally, the interview was short and took only 23 minutes.

In light of the relevant factors noted by the state court, a rational jurist could conclude that the encounter did not become so coercive that a reasonable person in Petitioner's circumstances would not have felt free to end the interrogation. See Hayden, 260 F.3d at 1066 (the defendant's "ability to leave was [not] in any other way restrained," and "the duration of the interviews was [not] excessive[and] undue pressure was [not] exerted"); United States v. Gregory, 891 F.2d 732, 735 (9th Cir.1989) (the defendant "consented to be interviewed . . . and no coercion or force was used"); United States v. Hudgens, 798 F.2d 1234 (9th Cir. 1986) (the defendant voluntarily entered a police car to talk to the police and the agents did not use intimidating or coercive language during the interview). Thus, the state court determination that he was not in custody at the time he confessed was reasonable.

Accordingly, Petitioner fails to demonstrate that the state court erred unreasonably in finding that Petitioner's constitutional rights under Miranda were not violated. The claim should be denied.

### 2. Ground Two

Petitioner next alleges the inconsistent evidence of Jane Doe 3's age was insufficient to find him guilty on count four. This claim was also presented on direct review, and in the last reasoned decision, the Fifth DCA denied the claim as follows:

> Morse contends inconsistencies in the evidence of Jane Doe 3's age at the time of the lewd and lascivious act alleged in count 4 make the evidence constitutionally insufficient to support the conviction on that count and require reversal. The People acknowledge the inconsistencies but contend the evidence, when viewed in the light most favorable to the judgment, was sufficient to prove Jane Doe 3 was under the age of 14 years at the time of the offense. We agree with the People.
>
> 1. *Standard of Review*
>
> When considering a challenge to the sufficiency of the evidence, we review the record in the light most favorable to the judgment to decide whether it contains substantial evidence—i.e., evidence that is reasonable, credible, and of solid value—from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780 (*Holmes*).) We presume in support of the judgment the existence of every fact the jury reasonably could have deduced from the evidence. (*Ibid.*)
>
> 2. *Governing Law*
>
> The crime charged in count 4 occurs when a "person ... willfully and lewdly commits any lewd or lascivious act ... upon or with the body, or any part or

16

> member thereof, of a child *who is under the age of 14 years*, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." (§ 288, subd. (a), italics added.) For conviction, "the subject of the attack must be a child under the age of 14 years, and proof of that fact must be made." (*People v. Levoy* (1920) 49 Cal.App. 770, 771.) Due process requires the prosecution prove the fact beyond a reasonable doubt. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a); *In re Winship* (1970) 397 U.S. 358, 364; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1115.)
>
> 3. *Analysis*
>
> The evidence on Jane Doe 3's age at the time of the offense charged in count 4 was in conflict at trial. As described in part I.E., *ante*, Jane Doe 3 testified that when she was 13 or 14 years old, Morse put his hand on her genital area over her clothes and pushed her underwear into her vagina after she awoke from a nightmare one night and got into his and Consuelo's bed. When questioned by the prosecutor, Jane Doe 3 stated she was in seventh or eighth grade and was 13 when the incident happened. When questioned by Morse's counsel, however, she said she could have been 14 and was "completely unsure one way or the other." Jane Doe 3 later told Morse's counsel she was "more sure" she was 13 because she was 14 when she entered high school and the incident happened before that. Consuelo testified Jane Doe 3 stopped going into Consuelo's bedroom at night when Jane Doe 3 was in middle school. Jane Doe 3 also testified her brother was still wearing diapers when the incident happened, and based on Consuelo's testimony about when he stopped wearing diapers, Jane Doe 3 would have been in middle school and only 11 years old. Hence, there was evidence, albeit contradicted, that Jane Doe 3 was less than 14 years old at the time of the incident underlying count 4.
>
> In assessing the sufficiency of the evidence to support the conviction, we must keep in mind the test is not whether we believe the evidence established Morse's guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; accord, *Holmes, supra*, 12 Cal.5th at p. 780.) Here, the jury might have disregarded the testimony that Jane Doe 3 could have been 14 when Morse put his hand on her genital area and believed the testimony she was 13 or 11 when the incident occurred. The resolution of conflicts and inconsistencies in testimony is the exclusive province of the jury unless there is patent falsity, inherent improbability, or other reason to question the validity of the testimony. (*People v. Gomez* (2018) 6 Cal.5th 243, 281.) Indeed, in another case in which the victim gave inconsistent testimony about whether she was 13 or 14 years old when the defendant committed a lewd and lascivious act on her, the Court of Appeal ruled: "The question of the apparent inconsistency was, thus, placed before the jury. It was the jury's prerogative, and not this court's, to resolve it." (*People v. Cantrell* (1992) 7 Cal.App.4th 523, 538; see *People v. Tompkins* (2010) 185 Cal.App.4th 1253, 1261 [inconsistency in victim's testimony "went only to the weight and credibility of the evidence and, on appeal, we do not disturb the jury's resolution of that inconsistency"].) "Accordingly, we find the contradictions in [Jane Doe 3's] testimony did not render it impossible to believe or obviously false, but merely presented the jury with a credibility determination that is not reviewable on appeal." (*People v. Mejia* (2007) 155 Cal.App.4th 86, 99.)

Morse, 2022 WL 2092822, at *7-8.

a. Legal Standard

The law on sufficiency of the evidence is clearly established. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they

believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

### b. Analysis

In rejecting the claim, the state court applied the Jackson standard. Therefore, the only question before the Court is whether that application was unreasonable. Viewing the evidence in the light most favorable to the prosecution, the state court's determination that there was sufficient evidence was not unreasonable.

As previously noted, in count four, Petitioner was charged with lewd and lascivious acts with a child under the age of 14 years. Specifically, the incident involved Jane Doe 3, who testified that Petitioner had placed his hand on her genital area and pressed her underwear into her vagina. Jane Doe 3's testimony with respect to her age at the time of the incident was inconsistent. On direct examination, she testified that she was in seventh or eighth grade and she was either 13 or 14. (Doc. 9-5 at 9-10.) Upon further questioning by the prosecutor, she stated that she was 13 at the time. (Doc. 9-5 at 10.) On cross-examination, she stated it could have been when she was 14, and she was unsure of the exact age. (Doc. 9-5 at 30.) Upon redirect, she stated that her brother was still in diapers when the incident occurred. (Doc. 9-5 at 41.) She also recalled testifying at the preliminary hearing one year-and-a-half prior to trial that she was 13 when the incident occurred. (Doc. 9-5 ta 42-43.) She testified that her preliminary hearing testimony was accurate. (Doc. 9-5 at 43.) The victim's mother testified that the brother stopped wearing diapers in 2010, when the victim was approximately 11 years old. (Doc. 9-5 at 128-29.) The victim's mother further testified that the victim stopped sleeping in their bed in middle school. (Doc. 9-5 at 128-29.)

In finding Petitioner guilty of count four, the jury necessarily resolved the inconsistencies in Jane Doe 3's testimony in determining that she was under 14 at the time of the incident. As set forth above, there was evidence from which a rational trier of fact could have found that the victim was under 14 at the time of the incident. The jury could have relied on her previous testimony in her preliminary hearing where she testified that she was 13 at the time. At trial, she indicated that her testimony had been accurate. The jury could also have drawn the inference that

19

she was under 14 from the fact that the victim's brother was wearing diapers at the time, and the mother had testified that the brother stopped wearing diapers when the victim was under the age of 14.

Petitioner has failed to demonstrate that no fairminded jurist would agree with the state court's conclusion that there was evidence from which the jury could find that the victim was under 14 at the time of the incident. Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the Jackson standard. The claim should be denied.

## IV.     RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **May 15, 2023**                                  /s/ *Sheila K. Oberto*
                                                          UNITED STATES MAGISTRATE JUDGE